**ROSEBUD SIOUX TRIBE, Plaintiff,**

Cheyenne River Sioux Tribe, Oglala Sioux Tribe, Standing Rock Sioux Tribe, Plaintiffs/Intervenors,

v.

**STATE OF SOUTH DAKOTA, George S. Mickelson, Governor; Roger Tellinghuisen, Attorney General; Jim Jones, Superintendent of the Highway Patrol, In Their Official Capacities, Defendants.**

Civ. No. 86–3019.

United States District Court, D. South Dakota, C.D.

March 31, 1989.

Terry L. Pechota, Finch, Viken, Viken & Pechota, Rapid City, S.D., for plaintiff Rosebud Sioux Tribe.

Scott B. McElroy, Bruce R. Greene, Greene, Meyer & McElroy, P.C., Boulder, Colo., and Krista Clark, Dakota Legal Services, Mission, S.D., for plaintiff-intervenor Cheyenne River Sioux Tribe.

Marvin Amiotte, Pine Ridge, S.D., for plaintiff-intervenor Oglala Sioux Tribe.

Michael T. Swallow, Dakota Plains Legal Services, Mission, S.D., for plaintiff-intervenor Standing Rock Sioux Tribe.

John P. Guhin, Harold H. Deering, Jr., Asst. Attys. Gen., Natural Resource Section, Pierre, S.D., for defendants.

## MEMORANDUM OPINION

DONALD J. PORTER, Chief Judge.

On May 14, 1986, the Rosebud Sioux Tribe filed this action against defendants, the State of South Dakota and various state officials (hereinafter "the State" or "South Dakota") to seek declaratory and injunctive relief restraining South Dakota from exercising jurisdiction over Indians on highways within the Rosebud Indian Reservation. The Rosebud Sioux Tribe invokes the jurisdiction of this Court under 28 U.S. C. §§ 1331, 1343(3) and (4), 1337, 1362 and 42 U.S.C. § 1983. This Court has permitted the Cheyenne River Sioux Tribe, Oglala Sioux Tribe, and Standing Rock Sioux Tribe to join as plaintiff-intervenors under Rule 24 of the Federal Rules of Civil Procedure. Based on an agreement filed by the parties to this case, this Court on November 19, 1987 ordered that the parties submit the case for decision on the merits by filing cross-motions for summary judgment. Having reviewed the lengthy original and supplemental briefing of the cross-motions for summary judgment and having carefully considered the issues, this Court denies the summary judgment motion filed by the tribal plaintiffs and grants summary judgment in favor of the State.

### I. FACTS

The essential facts in this case are not in dispute. The plaintiffs are federally recognized Indian tribes who sue as sovereign governmental entities and as parens patriae on behalf of tribal members. Each of the tribal plaintiffs presently patrols and enforces traffic laws on roads within their respective reservations. Each tribe has tribal courts, law enforcement officers and detention facilities. The tribes assert that with regard to offenses committed by Indians on roads within the reservations, the United States has exclusive jurisdiction over major crimes and the tribes have exclusive jurisdiction over other crimes.

Defendant South Dakota and its officials assert the authority to enforce state laws on all individuals on highways within the reservations. On several occasions, the State has arrested Indians on roads within Indian country for violating state laws.[1] The tribes have brought this suit to contest state jurisdiction over Indians on roads within Indian reservations. To resolve the case, this Court must examine the unique and complex history of jurisdiction over Indians in South Dakota.

## II. HISTORICAL DEVELOPMENT OF SOUTH DAKOTA JURISDICTION OVER INDIANS

### A. The Organic Law Disclaimer

The Enabling Act passed by Congress to permit South Dakota, North Dakota, Montana, and Washington to enter the Union required each state to disclaim jurisdiction in Indian country. Section 4 of the Enabling Act provided:

[T]he people inhabiting said proposed States do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States.

---

1. This Court is aware of three such cases: *State v. Medearis,* No. 85–26, slip op. (6th Judicial Cir.S.D., Jan. 21, 1986); *State v. Onihan,* Crim. No. 86–168, slip op. (5th Judicial Cir.S.D., May 27, 1987), *aff'd,* 427 N.W.2d 365 (S.D.1988); and *State v. Cloud,* slip op. (5th Judicial Cir.S.D., March 24, 1987). An opinion issued in *State v. Goodnick,* No. 85–19, slip op. (6th Judicial Cir. S.D., January 15, 1986), though the case involved a non-Indian defendant, held that South Dakota has jurisdiction over offenses committed by non-Indians and Indians alike on highways within Indian reservations. *Onihan* and *Cloud* involved prosecutions for drunk driving, while *Goodnick* involved both drunk driving and vehicular manslaughter charges. In *Medearis,* the defendant was charged with violating a state statute limiting the weight of certain vehicles driven on highways.

Act of February 22, 1889, ch. 180, § 4, 25 Stat. 676.[2]

In accordance with the Enabling Act, South Dakota incorporated the jurisdictional disclaimer as a compact with the United States in Article XXII of the state constitution. Article XXII, which remains as a part of the current South Dakota Constitution, states:

> [W]e, the people inhabiting the state of South Dakota, do agree and declare that we forever disclaim all right and title to the unappropriated public lands lying within the boundary of South Dakota, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States; and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States.

Under the 1889 Enabling Act, Article XXII of the South Dakota Constitution, and federal case law, South Dakota traditionally has exercised criminal or civil jurisdiction in Indian country only when Indians were not involved. *See generally St. Cloud v. United States,* 702 F.Supp. 1456, 1459–60 (D.S.D.1988) (South Dakota would have criminal jurisdiction over rape on reservation only if both victim and assailant were non-Indians); *White v. Califano,* 437 F.Supp. 543 (D.S.D.1977), *aff'd,* 581 F.2d 697 (8th Cir.1978) (federal rather than South Dakota court has jurisdiction in civil case for commitment of mentally ill Indian on reservation); *see generally Williams v. Lee,* 358 U.S. 217, 218–22, 79 S.Ct. 269, 269–72, 3 L.Ed.2d 251 (1959).

## B. Public Law 280

In 1953, Congress saw fit to alter its compact with disclaimer states by passing legislation known as Public Law 280. Act of Aug. 15, 1953, 67 Stat. 588–590 (codified in part at 18 U.S.C. § 1162 and 28 U.S.C. § 1360). Public Law 280 was passed during an era when Congress sought to diminish the federal trust responsibility to Indian tribes by terminating federal recognition of certain Indian tribes and encouraging assimilation of Indians into white society. Congress by passing Public Law 280 expressly ceded criminal and civil jurisdiction over Indian country to California, Minnesota, Nebraska, Oregon, and Wisconsin.[3] Public Law 280 gave all other states the option to assume civil and criminal jurisdiction in Indian country, even if the state had an organic law disclaimer of jurisdiction in Indian country as does South Dakota. The two sections of Public Law 280 that apply to South Dakota are sections six and seven,[4] which as originally enacted, stated:

> § 6. Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: Provided, That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be.

> § 7. The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal

---

**2.** Congress also required disclaimers of state jurisdiction over Indians in the enabling acts of Utah, Oklahoma, Arizona and New Mexico. See Act of July 16, 1894, ch. 138, 28 Stat. 107 (Utah); Act of June 16, 1906, ch. 3335, 34 Stat. 267 (Oklahoma); Act of June 20, 1910, ch. 310, 36 Stat. 557 (Arizona and New Mexico).

**3.** Public Law 280 exempted a few tribes in these five states from complete state jurisdiction. Congress later added Alaska as a state with

"mandatory" Public Law 280 jurisdiction over Native Americans. *See* 18 U.S.C. § 1162(a) and 28 U.S.C. § 1360(a).

**4.** The Supreme Court in *Washington v. Yakima Indian Nation,* 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979) ruled that both sections six and seven apply to states with organic law disclaimers like South Dakota. *Id.* at 496–97, 99 S.Ct. at 759–60.

offenses or civil causes of action, or with respect to both as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislation, obligate and bind the State to assumption thereof.

### C. South Dakota Legislation

In 1957, the South Dakota legislature enacted Chapter 319 of the Session Laws of 1957 to assume jurisdiction over Indian country within South Dakota. The Act in section one purported to accept complete criminal and civil jurisdiction over Indian country within the State, but sections four and five of the Act conditioned the assumption of jurisdiction on tribal consent and approval by the Board of County Commissioners of any county containing Indian country.[5] These conditions were not met, so this enactment never become operative. *See In re Petition of High Pine*, 78 S.D. 121, 129, 99 N.W.2d 38, 41 (1959).

In 1959, the South Dakota legislature passed a statute assuming jurisdiction over highways within Indian country built jointly by the state and federal governments.[6] This section, codified at SDCL § 1–1–17, was short-lived, as legislation passed in 1961 repealed the 1959 legislation.

The state enactment most critical to a decision in this case came in 1961 when the South Dakota legislature passed chapter 464 of the Session Laws of 1961 [hereinafter "1961 Act" or "1961 legislation"]. The 1961 legislation sought to authorize broad state jurisdiction over Indians, but only if the State could obtain funds from the federal government to defray the costs of law enforcement on reservations. During this era, South Dakota was reluctant to accept unqualified jurisdiction in Indian country primarily due to financial concerns.

The two most pertinent sections of the 1961 legislation provided:

Section 1. [codified at SDCL § 1–1–18] The State of South Dakota, in accordance with the provisions of 67 Statutes at large, page 589 (Public Law 280), hereby assumes and accepts jurisdiction of all criminal offenses and civil causes of action arising in the Indian Country located within this State as Indian Country is defined by Title 18 United States Code Annotated, section 1151, and obligates and binds this State to the assumption thereof.

Section 4. [codified at SDCL § 1–1–21] Except as to criminal offenses and civil causes of action arising on any highways, as the term is defined in chapter

---

5. The relevant provisions of Chapter 319 of the 1957 Session Laws stated:

Section 1. In accordance with the provisions of 67 statutes at large, page 589, Public Law 280, and as Indian Country is defined by Title 18 USCA, Section 1151, the provisions of Chapter 106 of the Session Laws of the State of South Dakota for 1901, as amended, or any law to the contrary, notwithstanding, the state of South Dakota assumes and accepts jurisdiction of all criminal and civil causes of action arising in Indian Country under the provisions of this Act as hereinafter set forth.

Section 4. Jurisdiction shall not be deemed assumed or accepted by this state in any county of South Dakota unless and until a resolution assuming and accepting the same is adopted by the Board of County Commissioners of any county containing Indian Country.

Section 5. Be it further provided that no assumption of civil or criminal jurisdiction shall become effective under the provisions of this Act until the Tribal council of a Tribe over which state jurisdiction is to be taken, shall have considered a referendum in which all persons eligible to vote at elections held

for the purposes of electing officers of such Tribe, shall have been given an opportunity to approve or disapprove such assumption of jurisdiction.

6. This statute stated:

The United States of America having ceded to the state of South Dakota concurrent police jurisdiction excepting the ten major crimes as defined by 18 USC section 1153, unless automobile accidents are involved, over all public highways or portions thereof, including rights-of-way, located within the state of South Dakota:

(1) Which are established through any Indian reservation or through any lands which have been allotted in severalty to any individual Indian, under any laws or treaties, but which have not been conveyed to the allottee with full power of alienation, and:

(2) Which were established or which are maintained by the joint participation of the United States and the state of South Dakota.

The state of South Dakota hereby accepts such jurisdiction.

SDCL § 1–1–17.

31–1,[7] the jurisdiction provided for in Section 1 herein shall not be deemed assumed or accepted by this State, ... unless and until the Governor of the State of South Dakota, if satisfied that the United States of America has made proper provisions for the reimbursement to this State and its counties for the added costs in connection with the assumption of said jurisdiction, has issued his proper proclamation duly filed with the Secretary of State declaring the said jurisdiction to be assumed and accepted.

The governor, however, never filed the proclamation required by section four, so the generalized assumption of jurisdiction did not take place. Nevertheless, it is on section four of this Act that South Dakota bases its assertion of jurisdiction over Indians on highways within Indian country. The State reads section one together with the exception clause of section four, now codified at SDCL § 1–1–21, to authorize state jurisdiction over Indians on reservation highways regardless of whether the governor satisfied the condition in section four of obtaining adequate funding from the federal government.

In 1963, the South Dakota legislature passed yet another statute, this time seeking to accept unconditionally jurisdiction in Indian country. This legislation also purported to repeal the 1961 Act. The 1963 legislation, however, was appropriately referred to a vote of the people of South Dakota. In the 1964 general election, South Dakota rejected the 1963 Act by a vote of 201,389 to 58,289 after Indian tribes lead a concerted publicity campaign against the 1963 law. *See White v. Califano*, 437 F.Supp. 543, 563 (D.S.D.1977), *aff'd*, 581 F.2d 697 (8th Cir.1978); R. Clow, *State Jurisdiction on Sioux Reservations: Indian and Non–Indian Responses, 1952– 1964*, 11 S.D.L.Rev. 171, 176–183 (1966). Under South Dakota law, the 1963 legislation never became effective since it was duly referred to a vote of the people and soundly defeated.

### D. In Re Petition of Hankins

The argument of the State that the exception clause of section 4 of the 1961 Act authorizes state jurisdiction on reservation highways was initially made before the Supreme Court of South Dakota to support the 1962 state court conviction of an Indian for drunken driving on an Indian reservation. In *In re Petition of Hankins*, 80 S.D. 435, 125 N.W.2d 839 (1964), the South Dakota Supreme Court confronted essentially the same question that this case presents: whether the 1961 legislation is an effective assumption of state jurisdiction over Indians on roads within Indian country. The court in *Hankins* concluded that Public Law 280 did not permit South Dakota to assume partial jurisdiction in Indian country over highways alone. The court also stated that partial state jurisdiction under the 1961 Act did not serve the purposes of Public Law 280 and would further complicate questions of who had jurisdiction over Indians. Thus, the court held that the 1961 Act was insufficient to take Public Law 280 jurisdiction and that the state lacked jurisdiction over an Indian driving while intoxicated on a highway within a reservation. *Id.* at 442–43, 125 N.W.2d at 843.

The South Dakota Supreme Court in a number of cases in the next fifteen years reaffirmed the holding in *Hankins*. For instance, in *Smith v. Temple*, 82 S.D. 650, 152 N.W.2d 547 (1967), the court held that South Dakota had no jurisdiction over a suit by one Indian against another Indian arising out of an automobile accident on a highway in Indian country. In *Smith*, the court stated:

[T]his state has not effectively, affirmatively, and unequivocally acted to assume jurisdiction in the manner specified in [Public Law 280], therefore ... criminal jurisdiction over Indians for crimes committed within Indian territory in South Dakota is exclusively vested in the Federal and Tribal courts.

---

7. SDCL § 31–1–1 states in part: Every way or place of whatever nature open to the public, as a matter of right, for purposes of vehicular travel, is a highway. The term "highway" shall not be deemed to include a roadway or driveway upon grounds owned by private persons, colleges, universities, or other institutions....

*Id.* 152 N.W.2d at 548. *See also State v. Molash,* 86 S.D. 558, 199 N.W.2d 591, 593 (1972); *State v. Hero,* 282 N.W.2d 70, 72 (S.D.1979) (South Dakota is not a Public Law 280 state). In addition, even the State took the position in litigation during the late 1960s and the 1970s that it had no jurisdiction over actions on Indian lands. *See, e.g., State v. White Horse,* 89 S.D. 196, 197–98, 231 N.W.2d 847, 848 (1975) (state stipulates to no jurisdiction over an Indian drunk driver in Indian country).[8]

### E. The Indian Civil Rights Act

Meanwhile, the congressional policy toward Indian tribes shifted in the 1960s from a policy promoting assimilation and termination of federal supervision to a renewed interest in encouraging tribal self-governance and self-reliance. Concomitant with this policy change, Congress enacted in 1968 the Indian Civil Rights Act (ICRA).[9] Part of the ICRA amended Public Law 280 to require tribal consent as expressed by a majority vote of enrolled adult tribal members before a state could assume further criminal or civil jurisdiction over Indians. The ICRA also authorized partial assumptions of state jurisdiction and left undisturbed state jurisdiction assumed from 1953 to 1968 under the original language of Public Law 280.

### F. Washington v. Yakima Indian Nation

An important event in the development of the dispute in this case occurred in 1979 when the United States Supreme Court decided *Washington v. Yakima Indian Nation,* 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979). In *Yakima Indian,* the Court considered whether the State of Washington properly assumed Public Law 280 jurisdiction through a 1963 statute which took

jurisdiction over eight subject matter areas and agreed to accept full jurisdiction upon the consent of individual tribes. The tribes in *Yakima Indian* challenged Washington's partial assumption of jurisdiction by advancing three arguments: 1) Washington had to amend its constitution before assuming Public Law 280 jurisdiction because Washington had an organic law disclaimer of jurisdiction in Indian country; 2) Public Law 280 did not permit the extension of partial state jurisdiction; and 3) the Washington statute violated the equal protection and due process guarantees of the Fourteenth Amendment. *Id.* at 466–67, 99 S.Ct. at 744. After a careful examination of Public Law 280, the Court rejected each of these contentions. Because the Washington legislature passed the statute at issue in 1963, the Court scrutinized the Washington statute under the original language of Public Law 280 rather than under the modifications to Public Law 280 contained in the 1968 enactment of the ICRA. *Id.* at 493 n. 40, 99 S.Ct. at 758 n. 40. The Court observed that Congress in 1953 intended Public Law 280 to facilitate and not to discourage the transfer of jurisdiction, *id.* at 490, 99 S.Ct. at 756, and determined that both sections six and seven of the original language of Public Law 280 apply to states with organic law disclaimers of jurisdiction in Indian country, like Washington or South Dakota, *id.* at 496–97, 99 S.Ct. at 759–60. The Court concluded that Washington's partial assumption of jurisdiction over Indians was not inconsistent with Public Law 280.

*Yakima Indian* reveals that the South Dakota Supreme Court in *In re Petition of Hankins,* 80 S.D. 435, 125 N.W.2d 839 (1964) misinterpreted provisions of Public

---

8. Additionally, in hearings before a congressional subcommittee reviewing Indian law, a representative of the office of the Attorney General of South Dakota stated that "South Dakota never assumed jurisdiction in Indian country." Statement of Walter W. Andre, Assistant Attorney General, State of South Dakota before the Subcommittee on Constitutional Rights of the Senate committee on the Judiciary, Constitutional Rights of American Indian Hearings on S. 961–68, S.J.Res. 40, U.S. Senate, 89th Cong., 1st Sess. (1965) (at 118).

9. The Indian Civil Rights Act, 82 Stat. 78, is codified at 25 U.S.C. §§ 1321–26.

By 1968, both states and tribes had become dissatisfied with provisions of Public Law 280. Tribes resented that states could unilaterally force state jurisdiction on tribes against the will of the Indian people, and the states disliked the way remaining federal protections seemed to deprive them of the ability to finance their newly acquired powers. Goldberg, *Public Law 280: The Limits of State Jurisdiction over Reservation Indians,* 22 UCLA L.Rev. 535, 538 (1975).

Law 280 in two important respects. First, the court in *Hankins* wrongly concluded that Public Law 280 did not permit a partial assumption of jurisdiction in Indian country. Second, the court mistakenly determined that only section six—rather than both sections six and seven—of the original version of Public Law 280 applied to South Dakota. These two flaws in *Hankins* severely erode the reasoning and holding in *Hankins* that the 1961 legislation was insufficient to empower South Dakota to enforce state law on Indians on highways within Indian country.

The State argues that the analysis in *Yakima Indian* alone disposes of this case. The State, however, overlooks several troublesome distinctions between this case and *Yakima Indian*. First, the Washington statute in *Yakima Indian* provided a procedure whereby tribes could consent to complete state jurisdiction in addition to unilaterally assuming partial jurisdiction over the following eight subject matters: 1) compulsory school attendance; 2) public assistance; 3) domestic relations; 4) mental illness; 5) juvenile delinquency; 6) adoption proceedings; 7) dependent children; and 8) operation of motor vehicles upon public streets, alleys, roads and highways. *Washington v. Yakima Indian Nation*, 439 U.S. 463, 465 n. 1, 99 S.Ct. 740, 744 n. 1, 58 L.Ed.2d 740 (1979). In rejecting an argument by the United States on behalf of the tribe that Washington's assumption of partial jurisdiction was inconsistent with the goals of Public Law 280, the Court reasoned:

> [The Washington law] does not reflect an attempt to reap the benefits and to avoid the burden of the jurisdictional offer made by Congress. To the contrary, the State must assume total jurisdiction whenever a tribal request is made that it do so.

Indeed, with the possible exception of highway jurisdiction which might yield revenue through fines from violations of traffic laws, the eight areas in which Washington assumed jurisdiction hardly reaped benefits for the state while averting burdensome responsibilities. By contrast, the assumption of jurisdiction by South Dakota solely over reservation roads without offering complete jurisdiction upon tribal consent arguably takes jurisdiction over perhaps the only part of law enforcement which comes close to being self-financing—i.e., enforcement of traffic laws.

The second distinction between *Yakima Indian* and the instant case is that the South Dakota statute at issue provides a far more questionable basis for Public Law 280 jurisdiction than did the Washington enactment. The 1961 South Dakota legislation was ruled ineffective in *In re Petition of Hankins*, 80 S.D. 435, 125 N.W.2d 839 (1964), and then went some two decades without being enforced. In addition, the 1961 Act indirectly assumes jurisdiction through a clause excepting highway jurisdiction in Indian country from a section making federal government financing a prerequisite to complete assumption of state jurisdiction in Indian country. The Washington statute at issue in *Yakima Indian* not only lacked the checkered history of the 1961 Act, but also was substantially more straightforward. Consequently, *Yakima Indian* alone does not resolve this case, as the state contends.

## G. State v. Onihan

Since *Yakima Indian* severely undermined the reasoning in *Hankins*, South Dakota after *Yakima Indian* reevaluated whether the 1961 legislation was an effective grant of state highway jurisdiction in Indian country. The 1961 Act, though never repealed, was omitted from the 1974 revision of the South Dakota Codified Laws because of the holding in *Hankins*. In the 1985 codification, however, the 1961 Act resurfaced as SDCL §§ 1–1–18 through 1–1–21. South Dakota also ended its hiatus in enforcement of state law on Indians on reservation highways. Beginning in January of 1986, several South Dakota trial courts read *Yakima Indian* to overrule *Hankins* and convicted Indians of violating South Dakota law while on highways in Indian country based on the 1961 legisla-

tion.[10] An appeal from one of these trial court rulings reached the South Dakota Supreme Court last year in the case of *State v. Onihan,* 427 N.W.2d 365 (S.D. 1988).

In *Onihan,* a state highway patrol officer arrested Dennis Onihan, an enrolled member of the Sisseton Wahpeton Sioux Tribe, for "driving under the influence" while on a highway within Indian trust land. In denying Onihan's motion to dismiss, the trial court ruled that South Dakota had jurisdiction over crimes committed by Indians on any highway within the State pursuant to section four of the 1961 Act, codified at SDCL § 1–1–21. *Id.* at 366. After reviewing both the history of Public Law 280 and the various attempts by South Dakota to take jurisdiction thereunder, the Supreme Court of South Dakota analyzed the legal issues in roughly three-quarters of a printed page. *Id.* at 370. The court abruptly concluded that the exception clause in SDCL § 1–1–21 was sufficient to transfer civil and criminal jurisdiction over Indians for activities on all highways within the state. *Id.* The court thus affirmed the trial court decision that the state had jurisdiction over an Indian on a highway in Indian country.[11] The court's treatment of *Hankins* and ultimate holding strongly suggest that *Hankins* is in effect overruled.[12]

## III. ANALYSIS

Based on this array of legislation and cases, this Court must determine two interrelated questions: 1) whether the 1961 Act fulfills the requirements of Public Law 280; and 2) whether the 1968 Indian Civil Rights Act amendment of Public Law 280 or the hiatus of some twenty years in enforcement of the 1961 enactment prevents South Dakota from assuming jurisdiction. This Court will consider each of these questions in turn.

A. The 1961 Act and Public Law 280

1. Extent of Deference to *Onihan* and Validity of the 1961 Act.

■ As a general rule, federal courts are bound by the interpretation of state law by the state's highest court. *Wainwright v. Goode,* 464 U.S. 78, 84, 104 S.Ct. 378, 382, 78 L.Ed.2d 187 (1983). Federal courts, however, need not abide by state court interpretations of federal law. The Supreme Court has also suggested that with respect to state court decisions involving Public Law 280, a federal court may review state court interpretations of state law influenced by an accompanying interpretation of Public Law 280. *Three Affiliated Tribes of Ft. Berthold Reservation v. Wold Engineering, P.C.,* 467 U.S. 138, 151–52, 104 S.Ct. 2267, 2275–76, 81 L.Ed.2d 113 (1984).

■ In light of *Onihan,* this Court is unwilling to declare the 1961 legislation to be an invalid legislative act. Despite the withdrawal of the 1961 legislation from the South Dakota Codified Laws between 1974 and 1985, the South Dakota legislature never effectively repealed the 1961 enactment. Although legislation passed in 1963 would have repealed the 1961 Act, the 1963 legislation never became effective because of the successful referendum in the 1964 election. Though the South Dakota case of *In re Petition of Hankins,* 80 S.D. 435, 125 N.W.2d 839 (1964) seemed to invalidate the 1961 Act, subsequent cases essentially have overruled *Hankins* and resurrected the 1961 Act. This Court deems it best to defer to the implicit holding of the South Dakota Supreme Court in *State v. Onihan,* 427 N.W.2d 365 (S.D.1988) that the 1961 legislation remains an effective state statute notwithstanding its checkered history.

---

**10.** *See* cases cited in *supra* footnote 1.

**11.** The court also held that SDCL § 1–1–21 when read together with SDCL § 1–1–18 satisfied the requirement of "affirmative legislative action," as set out in *Kennerly v. District Court of Ninth Judicial Dist. of Montana,* 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971).

**12.** The court stated:

It seems clear that to the extent that *Hankins* held that state assumption of partial jurisdiction was invalid under Public Law 280, it is now overruled by *Yakima.*

*Id.* at 369.

2. Sufficiency of the 1961 Act under Public Law 280.

The question of whether the 1961 legislation is sufficient to assume Public Law 280 jurisdiction presents an issue squarely within this Court's authority to interpret and apply federal law. *Washington v. Yakima Indian Nation*, 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979) disposes of several potential issues in this case by establishing that states with constitutional disclaimers need not amend their constitutions to take jurisdiction under Public Law 280, *id.* at 484–93, 99 S.Ct. at 753–58, and that assumption of partial jurisdiction over Indians does not contravene the version of Public Law 280 in effect from 1953 to 1968, *id.* at 493–500, 99 S.Ct. at 757–61. Since the South Dakota statute at issue in this case predates the 1968 Indian Civil Rights Act, this state enactment must meet the requirements of the original version of Public Law 280 in effect from 1953 until 1968. *Id.* at 493 n. 40, 99 S.Ct. at 758 n. 40; *Three Affiliated Tribes of Ft. Berthold Reservation v. Wold Engineering, P.C.*, 467 U.S. 138, 150–51, 104 S.Ct. 2267, 2275–76, 81 L.Ed.2d 113 (1984).

 To acquire jurisdiction under the original version of Public Law 280, a state must fulfill apparently only two requirements: 1) affirmative legislative action; and 2) consistency with the purposes of Public Law 280. The Supreme Court in *Kennerly v. District Court of Ninth Judicial District of Montana*, 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971) specifically stated the requirement that a state take "affirmative legislative action" to acquire Public Law 280 jurisdiction. *Kennerly* derived the requirement of affirmative legislative action from the scant legislative history and the wording of section seven of the 1953 version of Public Law 280. *Id.* at 427, 91 S.Ct. at 482. The Court in *Kennerly* held that unilateral action by the Blackfeet Indian Tribal Council in enacting a law providing for concurrent state and tribal court jurisdiction over cases involving Indian defendants was insufficient to vest state courts with jurisdiction under either the original or amended versions of Public Law

280. In *Onihan v. State*, 427 N.W.2d 365 (S.D.1988), the South Dakota Supreme Court—though not mentioning *Kennerly* specifically—concluded that the exception clause in SDCL § 1–1–21 when read together with SDCL § 1–1–18 qualified as "affirmative legislative action." This Court perceives no reason to disturb this portion of *Onihan* since the *Kennerly* standard of affirmative legislative action appears to require little more than a bill duly enacted via the state legislative process.

The second requirement of consistency with the purpose of Public Law 280 is implicit from a number of federal decisions. *See, e.g., Washington v. Yakima Indian Nation*, 439 U.S. 463, 498–99, 99 S.Ct. 740, 760–61, 58 L.Ed.2d 740 (1979) (analyzing whether Washington statute was consonant with the legislative intent of Public Law 280). Although apparently no court has explicitly stated consistency with the goals of Public Law 280 as a prerequisite to a proper assumption of state jurisdiction thereunder, nearly every federal court when faced with a difficult question under Public Law 280 has analyzed the legislative intent of Congress and evaluated the propriety of state jurisdiction in light of the legislative history. *See, e.g., California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207–08, 107 S.Ct. 1083, 1087–88, 94 L.Ed.2d 244 (1987); *Three Affiliated Tribes of Ft. Berthold Reservation v. Wold Engineering, P.C.*, 467 U.S. 138, 143, 104 S.Ct. 2267, 2271, 81 L.Ed.2d 113 (1984); *Yakima Indian*, 439 U.S. at 498–99, 99 S.Ct. at 760–61; *Bryan v. Itasca County*, 426 U.S. 373, 379–391, 96 S.Ct. 2102, 2106–07, 48 L.Ed.2d 710 (1976); *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655, 662–64 (9th Cir.1975), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1979).

The legislative history surrounding the passage of Public Law 280 in 1953 is somewhat equivocal and sparse. Nevertheless, the United States Supreme Court in *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) examined and discerned the congressional intent in enacting Public Law 280. In *Bryan*, the Supreme Court held that the explicit grant of

jurisdiction contained in Public Law 280 to the State of Minnesota did not authorize a Minnesota county to levy personal property taxes on a mobile home located on Indian trust land and owned by an enrolled member of the Minnesota Chippewa Tribe. The Court, after carefully analyzing the legislative history of Public Law 280, determined that the primary concern of Congress in enacting Public Law 280 was to deal with the problem of lawlessness and the absence of adequate tribal law enforcement on certain reservations. *Id.* at 379, 96 S.Ct. at 2106. The Court also noted that Public Law 280 "was plainly not meant to effect total assimilation." *Id.* at 387, 96 S.Ct. at 2110.[13] In addition, the Court examined the effect of the ICRA on Public Law 280 and construed the initial Public Law 280 grant in light of the ICRA modifications. *Id.* at 386, 96 S.Ct. at 2109.

The Supreme Court reaffirmed this interpretation of Public Law 280 in *Washington v. Yakima Indian Nation,* 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979), but noted that Public Law 280 was designed to facilitate, not to frustrate, the transfer to states of jurisdiction over Indians. *Id.* at 490, 99 S.Ct. at 756.[14] In addition, other authority

suggests that besides reducing lawlessness on reservations, Congress also intended Public Law 280 to accomplish two subsidiary goals: 1) lessening the burden on the federal government of the trust relationship with Indian tribes; and 2) gradually placing the responsibility on individual states to provide criminal and civil forums and laws to govern Indian people.[15] The 1961 Act appears to satisfy the goal of beginning a gradual transfer of responsibility over Indians to the State, but is not likely to alleviate much of the burden of the federal trust relationship. However, it is the primary congressional goal of reducing perceived lawlessness on reservations and the motive of South Dakota in seeking partial Public Law 280 jurisdiction that concerns this Court.

The State contends that state jurisdiction over Indians on reservation highways will reduce lawlessness in Indian country and has presented statistics to demonstrate that the rate of fatal highway accidents tends to be three times higher on South Dakota Indian reservations than throughout the rest of South Dakota. Additionally, the State asserts that the political na-

**13.** The Court in *Bryan* also quoted the opinion of the Court of Appeals for the Ninth Circuit in *Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655, 663 (9th Cir.1975), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1979) in stating "courts 'are not obliged in ambiguous instances to strain to implement [an assimilationist] policy Congress has now rejected, particularly where to do so will interfere with the present congressional approach to what is, after all, an ongoing relationship.'" *Bryan,* 426 U.S. at 388, n. 14, 96 S.Ct. at 2110, n. 14. Related maxims of statutory construction in Indian law require this Court to resolve ambiguities in favor of Native Americans and to construe liberally statutes passed on behalf of Native Americans. *Antoine v. Washington,* 420 U.S. 194, 199–200, 95 S.Ct. 944, 948, 43 L.Ed.2d 129 (1975); *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973). A court, however, may not use these canons of construction to change the meaning of unambiguous statutes or to disregard the express intent of Congress. *South Carolina v. Catawba Indian Tribe,* 476 U.S. 498, 506, 106 S.Ct. 2039, 2043, 90 L.Ed.2d 490 (1986).

**14.** The report of the committee considering Public Law 280 suggests that the law was a part of the congressional attempt to diminish federal

responsibility for Indian affairs and eventually terminate federal supervision altogether. *See generally* HR Rep. no. 848, 83d Cong., 1st Sess. (1953); S.Rep. No. 699, 83d Cong., 1st Sess. (1953).

**15.** *See* Goldberg, *Public Law 280: The Limits of State Jurisdiction over Reservation Indians,* 22 UCLA L.Rev. 535, 542 (1975).

The federal government has abandoned the policy of transferring its trust responsibilities to the states and has adopted legislation encouraging tribal self-dependence and sovereignty. Nevertheless, this Court must apply Public Law 280 as it existed in 1953. *Washington v. Yakima Indian Nation,* 439 U.S. 463, 493 n. 40, 99 S.Ct. 740, 758 n. 40, 58 L.Ed.2d 740 (1979); *cf., Shakopee Mdewakanton Sioux Community v. Prior Lake,* 771 F.2d 1153 (8th Cir.1985), *cert. denied,* 475 U.S. 1011, 106 S.Ct. 1185, 89 L.Ed.2d 301 (1986) (consent of Indian tribe embodied in 1968 ICRA amendment not required prior to municipality's annexation of reservation land in Minnesota since Minnesota acquired jurisdiction under original enactment of Public Law 280); *St. Cloud v. United States,* 702 F.Supp. 1456 (D.S.D.1988) (reluctantly applying termination legislation though termination policy long abandoned).

ture of tribal law enforcement frustrates stringent enforcement of drunk driving laws by the tribes. The plaintiff tribes strongly contest these contentions and point to shortcomings and inconsistencies in the statistics presented by the State. The tribal plaintiffs argue that despite modest budgets for law enforcement, tribal law enforcement is effective.

This Court is reluctant to make a hasty judgment on the efficacy of tribal law enforcement on each of the reservations within South Dakota. Even if the position of the tribal plaintiffs is taken as true, however, the addition of another law enforcement authority with jurisdiction over Indians on highways within Indian country would serve to ensure even further compliance with traffic laws. This Court therefore cannot conclude that the extension of state highway jurisdiction under the 1961 Act disserves the legislative intent of Public Law 280 to reduce perceived lawlessness on reservations.[16]

This Court, nevertheless, is concerned that South Dakota may be asserting jurisdiction over Indians on highways to raise revenue through traffic ticketing rather than to promote the goals of Public Law 280. The plaintiff tribes assert that the state exercise of jurisdiction over Indians on highways within Indian reservations partially robs from the tribes a source of

revenue—fines from traffic tickets.[17] The history and language of the 1961 legislation indicate that the State was concerned about financing state law enforcement in Indian country. Presumably, the chief reason for excepting highway jurisdiction from the conditional language codified in SDCL § 1–1–21 was that highway jurisdiction is somewhat self-financing as a result of monies collected from traffic tickets.

Throughout this litigation, the State has downplayed the ability of traffic ticket proceeds to offset costs of law enforcement on highways in Indian country. Rather, the State has emphasized that its motive in extending state highway jurisdiction to Indians in Indian country is to reduce accidents and instances of drunk driving. Indeed, all but one of the arrests of Indians based on the 1961 legislation that this Court is aware of involved intoxicated drivers.[18] Given the evidence presented, it appears that the State does not intend to exercise jurisdiction over Indians as a means of revenue raising.[19] Moreover, though financing law enforcement on reservation Indians was a clear concern of the 1961 legislation, there is no evidence that the 1961 Act was enacted as a guise for collecting monies from Indians. Thus, there are insufficient grounds to conclude that the 1961 Act is inconsistent with the policy of Public Law 280.[20]

**16.** Certainly there are a number of policy arguments for limited South Dakota jurisdiction on reservation highways since state jurisdiction over Indians might lead to strained relationships between the State and tribes, the weakening of tribal law enforcement authority, and the surfacing of difficult jurisdictional questions. Congress in passing Public Law 280 in 1953, however, made the policy decision to permit unilateral assumption by states of jurisdiction over Indians notwithstanding the unpleasant consequences. This Court is not empowered to alter such congressional policy decisions. Such arguments against state jurisdiction are better directed to Congress or the South Dakota legislature.

**17.** State jurisdiction over Indians on reservations pursuant to Public Law 280 is concurrent with continued tribal jurisdiction. F. Cohen, Handbook of Federal Indian Law 367 (1982 ed.). Thus, state enforcement of its traffic laws might dilute—but would not eliminate—tribal revenue from traffic tickets.

**18.** *See* cases cited in *supra* footnote 1; *see also In re Petition of Hankins,* 80 S.D. 435, 125 N.W. 2d 839 (1964) (drunk driving arrest of Indian under 1961 legislation at issue).

**19.** If the State's conduct in enforcing its traffic laws on Indians in Indian country demonstrates that this conclusion is mistaken, this Court might reevaluate its judgment. Ideally, the State should negotiate with the tribe a means of dividing traffic ticket monies if the amounts collected by the State exceed the cost of enforcing state traffic laws on reservation Indians.

**20.** The South Dakota Supreme Court in *In re Petition of Hankins,* 80 S.D. 435, 125 N.W.2d 839 (1964) reached the contrary conclusion. The Court in *Hankins* reasoned:

It seems to us that [the 1961] legislation does not tend to accomplish or promote the congressional purposes of Public Law 280. To the contrary, it would proliferate the law enforcement authorities in Indian country by

## B. Effect of 1968 ICRA Amendment of Public Law 280

■ The plaintiff tribes argue that South Dakota's assertion of jurisdiction over reservation Indians contravenes the 1968 amendments to Public Law 280 enacted through the Indian Civil Rights Act, 82 Stat. 78, codified at 25 U.S.C. § 1321–26. If the ICRA amendments to Public Law 280 apply, assumption of jurisdiction by South Dakota is invalid since the ICRA made consent of Indian people a prerequisite to further assumption of state jurisdiction under Public Law 280. *See* 25 U.S.C. §§ 1321, 1322, 1326. Indian tribes within South Dakota have never consented to— and indeed have consistently and adamantly objected to—state jurisdiction over Indians in Indian country. To support their assertion that the ICRA amendments apply to this case, the tribes appear to make two separate arguments: 1) South Dakota had not assumed jurisdiction in Indian country before the 1968 ICRA amendments and thus the post–1968 version of Public Law 280 governs; and 2) Congress in enacting the ICRA intended to include South Dakota in the provisions requiring tribal consent for Public Law 280 jurisdiction for states

"not having jurisdiction over ... Indians in ... Indian country."

The analysis in the previous section of this opinion demonstrates that the assumption of jurisdiction at issue in this case occurred in 1961.[21] The ICRA itself [22] and two Supreme Court cases make clear that the ICRA amendments did not affect assumptions of state jurisdiction predating 1968, and thus state enactments before 1968 must be judged under the original version of Public Law 280. *Three Affiliated Tribes of Ft. Berthold Reservation v. Wold Engineering, P.C.*, 467 U.S. 138, 150–51, 104 S.Ct. 2267, 2275–76, 81 L.Ed.2d 113 (1984); *Washington v. Yakima Indian Nation*, 439 U.S. 463, 493 n. 40, 99 S.Ct. 740, 758 n. 40, 58 L.Ed.2d 740 (1979). Not until 1968 did Public Law 280 contain a provision requiring tribal consent to state assumptions of jurisdiction in Indian country. *See* Goldberg, *Public Law 280: The Limits of State Jurisdiction over Reservation Indians,* 22 UCLA L.Rev. 535, 544–45 (1975) (tribal consent intentionally omitted from 1953 enactment of Public Law 280). The 1961 legislation withstands scrutiny under the applicable federal law and thus must be upheld notwithstanding provisions in the ICRA. *Cf., Washington v. Yakima*

---

adding the state as another entity with geographically limited jurisdiction where the Federal and Tribal courts already operate, each with limited subject matter jurisdiction. Moreover, it makes inescapable the checkerboard jurisdiction condemned in *Seymour v. Superintendent,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 [ (1962) ], wherever the extent of the highway right of way is not clear from markings on the ground. This we think would be commonplace on highways in our sparsely settled Indian reservations.

*Id.* 80 S.D. at 443, 125 N.W.2d at 843.

The court in *Hankins* believed that Congress in enacting Public Law 280 had two goals: 1) withdrawal of federal responsibility where practicable; and 2) termination of the federal trust relationship. *Id.* Supreme Court cases subsequent to 1964 demonstrate that the court in *Hankins* misunderstood the primary intent of Congress. The *Hankins* court also misread Public Law 280 to disapprove of the partial assumption of state jurisdiction. These misinterpretations of Public Law 280 prompted the *Hankins* court to conclude that the 1961 legislation departed from the intent of Congress. Consequently, the language in *Hankins* quoted above is not persuasive.

**21.** This Court's holding would be entirely different if it found that the assumption of jurisdiction occurred sometime after 1979 when *Yakima Indian* revealed errors in the legal analysis of *In re Petition of Hankins,* 80 S.D. 435, 125 N.W.2d 839 (1964). Indeed, if any event after 1968 is taken as the time of South Dakota's assumption of jurisdiction, both the requirements of tribal consent in the ICRA and of affirmative legislative action expressed in *Kennerly v. District Court of Montana,* 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971) would be violated. However, the 1961 legislation—rather than the rebirth of state enforcement of that enactment following *Yakima Indian*—is the assumption of Public Law 280 jurisdiction that must be scrutinized.

**22.** Section 403(b) of Title IV of the ICRA, codified at 25 U.S.C. § 1323(b), states:

Section 7 of [the 1953 enactment of Public Law 280] is hereby repealed, but such repeal shall not affect any cession of jurisdiction made pursuant to such section prior to its repeal.

*Indian Nation,* 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979) (upholding Washington assumption of Public Law 280 jurisdiction without tribal consent when Washington statute predated ICRA amendment of Public Law 280); *see also Shakopee Mdewakanton Sioux Community v. Prior Lake,* 771 F.2d 1153 (8th Cir.1985), *cert. denied,* 475 U.S. 1011, 106 S.Ct. 1185, 89 L.Ed.2d 301 (1986) (tribal consent not required when Minnesota municipality annexes reservation land since Minnesota obtained Public Law 280 jurisdiction under the original language enacted in 1953).

The second argument of the tribes for the application of the ICRA amendments to this case is that Congress in 1968 believed that South Dakota had failed to take Public Law 280 jurisdiction altogether and thus intended the ICRA requirement of tribal consent to apply to South Dakota. The crux of this argument is that Congress intended South Dakota to be encompassed as a state "not having jurisdiction over . . . Indians in . . . Indian country" as that language is used in sections requiring tribal consent for extensions of state criminal and civil laws.[23] The South Dakota cases in the 1960s disavowing state jurisdiction over reservation Indians [24] and a very small portion of the legislative history [25] support this argument. The tribes thus argue that whatever jurisdiction South Dakota now asserts must be judged under the ICRA amendments to Public Law 280.

It is difficult to reconcile the tribes' interpretation of the ICRA with Section 403(b) of Title IV of the ICRA, 25 U.S.C. § 1323(b), which provides that the partial repeal of the original language of Public Law 280 "shall not affect any cession of jurisdiction" made under the initial provision authorizing "option" states like South Dakota to assume jurisdiction in Indian country. The legislative history and language of the ICRA indicate that Congress in referring to states "not having jurisdiction" intended neither to single out any particular state or states nor to adjudge which states had or had not assumed jurisdiction before 1968 under Public Law 280. This Court perceives no ambiguity in the ICRA language as it applies to South Dakota. Sections of the ICRA codified at 25 U.S.C. §§ 1321 and 1322 requiring tribal consent would apply to South Dakota attempts to assume jurisdiction after 1968; however, under the ICRA section codified at 25 U.S.C. § 1323(b), the tribal consent requirement in the ICRA would not apply to whatever jurisdiction South Dakota had properly assumed prior to 1968. Consequently, the ICRA amendments do not affect the analysis of what jurisdiction South Dakota assumed under the 1961 legislation.

---

**23.** Section 401(a) of Title IV of the ICRA, codified at 25 U.S.C. § 1321(a), states:

The consent of the United States is hereby given to any state not having jurisdiction over criminal offenses committed by or against Indians in the areas of Indian country situated within such State to assume, with the consent of the Indian tribe occupying the particular Indian country or part thereof which could be affected by such assumption, such measure of jurisdiction over any or all of such offenses committed within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over any such offense committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.

Section 402(a) of Title IV of the ICRA, 25 U.S.C. § 1322(a) provides:

The consent of the United States is hereby given to any State not having jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, with the consent of the tribe occupying the particular Indian country or part thereof which would be affected by such assumption, such measure of jurisdiction over any or all such civil causes of action arising within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.

**24.** *See, e.g., Smith v. Temple,* 82 S.D. 650, 152 N.W.2d 547 (1967); *In re Petition of Hankins,* 80 S.D. 435, 125 N.W.2d 839 (1964).

**25.** *See supra* footnote 7.

## C. Effect of the Lapse in Enforcement in South Dakota of Public Law 280 Jurisdiction

■ The tribal plaintiffs also argue that it is improper for South Dakota to assert jurisdiction under the 1961 legislation after failing to enforce state jurisdiction over Indians on reservation highways for some twenty years between 1964 and roughly 1984. The tribes cite United States Supreme Court cases recognizing that long-standing practices may create "justifiable expectations" and a "jurisdictional history," which may affect interpretation of unclear legislation pertaining to Indian laws. For example, in *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), the Court in examining whether Congress intended to disestablish part of the Rosebud Sioux Reservation through legislation enacted in 1904, noted that:

> ... the fact that neither Congress nor the Bureau of Indian Affairs has sought to exercise its authority over this area, or to challenge the State's exercise of authority, is a factor entitled to weight as a part of the "jurisdictional history." The long-standing assumption of jurisdiction by the State over an area that is over 90% non-Indian, both in population and in land use, not only demonstrates the parties' understanding of the meaning of the Act, but has created justifiable expectations which should not be upset by so strained a reading of the Acts of Congress as petitioner urges. We are simply unable to conclude that the intent of the 1904 Act was other than to disestablish.

*Id.* at 604–05, 97 S.Ct. at 1372–73; *see also DeCoteau v. District County Court,* 420 U.S. 425, 442, 95 S.Ct. 1082, 1091, 43 L.Ed.2d 300 (1975); *Solem v. Bartlett,* 465 U.S. 463, 471, 104 S.Ct. 1161, 1166, 79 L.Ed.2d 443 (1984).

The Supreme Court cases relying on jurisdictional history and justifiable expectations are not pertinent to this case for two reasons. First, the "jurisdictional history" and "justifiable expectations" devices are guides for interpretation of unclear statutes. The twenty year hiatus in enforcement under the 1961 Act hardly aids this Court in understanding the pertinent provisions of Public Law 280 and truly only demonstrates that the State took seriously the decision in *In re Petition of Hankins,* 80 S.D. 435, 125 N.W.2d 839 (1964), which ruled the 1961 legislation insufficient to accept Public Law 280 jurisdiction. The difficulty with the 1961 legislation is not that it is unclear, but that it has a somewhat checkered history. The twenty year hiatus in state enforcement of its laws against Indians on reservation highways simply is not a useful interpretive tool since it does not influence a proper understanding of the 1961 legislation or Public Law 280.

Second, state assumption of jurisdiction over Indians on reservation highways does not truly disrupt "justifiable expectations" resulting from the twenty year respite in state enforcement. The tribes imply that enforcement of state law on reservation highways will undermine tribal law enforcement which has been nurtured in the last two decades. As this Court stated earlier, state highway authority under Public Law 280 would be concurrent with continued tribal authority. The State is not displacing tribal authority, but is complimenting it with regard to criminal and civil jurisdiction. Although the tribes through the late 1960s and the 1970s may have expected that they would remain the sole authority over Indians on Indian country highways, the sharing of such authority with the State does not constitute such a severe disruption of "justifiable expectations" to merit disregarding compelling legal reasons for acknowledging the enforceability of the 1961 legislation. Though this Court is sympathetic to the position of the plaintiff tribes, the jurisdictional history and justifiable expectations analysis in several Supreme Court cases are insufficient grounds to grant judgment in favor of the tribes.

## IV. CONCLUSION

Pursuant to the 1953 version of Public Law 280 and state legislation enacted in 1961, South Dakota validly assumed civil and criminal jurisdiction concurrent with

the tribes over Indians on all highways within the state. Although the 1961 legislation has a rather checkered history, this Court respects the decision of the Supreme Court of South Dakota that the law remains in effect. The 1961 legislation complies with applicable federal law requirements under the original language of Public Law 280. Neither the 1968 amendment of Public Law 280 nor the lapse of some twenty years in state enforcement alters the conclusion that South Dakota effectively assumed jurisdiction under Public Law 280. Therefore, this Court denies the motion for summary judgment of the tribal plaintiffs and grants the summary judgment motion filed by the state defendants.